ORIGINAL

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED
MAY - 1 2012
CLERK, U.S. DISTRICT COURT
By _____ Deputy

| | |
|---|---|
| UNITED STATES | § |
|     Respondent, | § |
| | § Case No. 3:06-CR-369-R |
| vs. | § |
| | § |
| RONALD C. PEARSON. | § |
|     Movant. | § |

---

## VERIFIED MEMORANDUM OF LAW IN SUPPORT OF REQUEST
## FOR MODIFICATION OF SPECIAL TERMS OF SUPERVISED RELEASE

---

As Ronald Pearson nears the end of his incarceration for violation of 18USC § 2255(A)(2) and 70 months sentence, he respectfully asks the Court to review and modify his special conditions of supervision. He makes <u>no</u> claim that the original conditions of supervised release were unlawfully imposed or that the sentence was illegal.

Pearson posits that his conduct, both prior to sentencing and while confined demonstrate post conviction rehabilitation a

change in circumsance sufficient to justify alteration of his special conditions of supervised release.

However, Movant Pearson believes that 18 USC §3583(e)(2) vests the sentencing Court with jurisdiction to alter the conditions of supervised release post sentencing and does not require the District Court to find "change of circumstances" in order to modify conditions of supervised release. See U.S. v. Davies, 380 F.3d 329 (8th Cir. 2004). The fact that a District Court retains the discretion to determine whether there are valid reasons to modify does not impose a limitation on the District Court's power to modify. U.S. v. Gegay, 631 F.3d 1168, 1173 (10th Cir. 2011). Sentences of supervised release are subject to considerably more alteration then sentences of imprisonment. Id.

As to the timing of a District Court's review of the imposition of conditions of supervised release, the 10th Circuit in Begay found that "it is arguable a District Court is in a more informed position to evaluate a defendant's conditions of release immediately prior to a defendant's release rather than at the time of sentencing. Id."

It is on this basis that Movant submits the following argument and respectfully asks the Court to exercise its discretion and alter the special terms of supervised release.

## DISCUSSION

Pearson argues and asks that the Court consider the fact that he has done everything possible since his plea of guilt and incarceration to prepare himself to reenter society as a law abiding citizen.  Prior to sentencing, Pearson underwent phychological testing and participated in Sex Offender Group Treatment sessions and in the words of Franklin D. Lewis, Clinical and Forensic Psychologist, "Pearson continues to be in compliance with treatment goals and objectives and he fully accepts responsibility for his criminal offense." See Exhibit A.

While incarcerated at Seagoville FCI, Pearson sucessfully completed the year long (July 27, 2009 through July 27, 2010) Sex Offender Treatment Program under Dr. Shadduck, SOMP Coordinator (See Exhibit B) and the Federal Victims Impact Program (See Exhibit C). His most recent Institutional Progress Report shows a clean record withou incident.  Also tendered for the Court's consideration is the recent study by the State of Conneticut dated February 15, 2012 which points to an extremely low recidivism rate of 3.6% for sex offenders charged with a new sex crime.

### A.

### SPECIAL CONDITION 1

### The Requirement of Psycho-Physiological Testing

Defendant posits that his sucessful sex offender group

treatment participation and his sucessful completion of the year long SOMP program and Victim Impact program - obviate the necessity of his sumission to Abel testing or any penile plethysmograph testing. These changed circumstances are relevant for the Court's consideration under 3583 (e)(2).

Also relevant are Federal District Court findings that both procedures have inherent defects that render them unreliable as testing mediums. In U.S v. Weber, 451 F.3d 552, 564 (9th Cir. 2006), the Appeals Court described the physically and mentally intrusive penile plethysmograph thusly:

> "Prior to beginning the test, the subject is typically given instructions about what the procedure entails. He is then asked to place the device on his penis and instructed to become fully aroused, either sel-stimulation or by the presentation of so-called 'warm-up stimuli,' in order to derive a baseline against which to compare later erectile measurements. After the individual returns to a state of detumesence, he is presented with various erotic and non-erotic stimuli. He is instructed to let himself become aroused in response to any of the materials that he finds sexually exciting. These stimuli come in one of three modalities -- slides, film/videoclips, and auditory vignettes -- though in some cases different types of stimuli are presented simultaneously. The materials depict individuals of different ages and genders -- in some cases even possessing different anatomical features -- and portray sexual scenarios involving various degrees of coercion. The stimuli may be presented for periods of varying length -- from mere seconds to four minutes or longer. Changes in penile dimension are recorded after the presentation of each stimulus..."

A 9th Circuit Appeals panel has found the plethysmorgraph test to be scientifically unreliable and inadmissible under Glanzer v. Glanzer, 232 F.3d 1258, 1266 (9th Cir. 2000). The District Court in Ready v. Mass, 2002 Mass. Super. LEXIS 557,

2002 WL 12155800 (Mass. SUper. May 17, 2002) found that "the penile plethysmograph ("ppg") is itself subject to faking." Its companion, the Abel test, was found wanting in U.S. v. Birdsbill 243 F. Supp. 2d 11228 (E.D. Montanna 2003) in that "the test itself failed to provide necessary verification of its validity and independant studies concerning the test failed to verify the theory of the test. Moreover, the substantial potential error rate of the test made it highly unreliable, and the scientific community did not generally accept the test for diagnostic purposes.

Given the above noted deficiencies in those specific procedures and considering the positive circumstances of the Defendant's passage and completion of the year long Federal Sex Offender Treatment Program, it would be reasonable to remove these tests from Defendant's therapy requirements.

B.

### SPECIAL CONDITION 2

### The Ban of "Any Form of Unsupervised Contact With Minors Under the Age of 18 at Any Location."

Defendant seeks a smooth transition and reintroduction into society. Everday activities common to all citizens include shopping, eating, travel, working, attending public functions such as sports and music events, and attending religious services and functions. Unintentional casual contact with a supermarket cashier who is a minor, riding the bus where people

of all ages travel, watching 4th of July fireworks etc... where thousands attend, going to a Dallas Cowboys football game — all would pose no inherent danger to the public given the passage of years in Defendant's case and the change of his circumstances given his completion of the Federal Sex Offender Treatment Program (SOMP).

The exemption of such everyday "casual contacts" from the definition of "unsupervised contact" will accomplish the legitimate goal of prohibiting the Defendant from intentionally associating with minors for sexual purposes while at the same time allowing him to function as a human being and citizen in society.

C.

### SPECIAL CONDITION 3

### Ban on Possession of Pornographic, Sexually Oriented or Sexually Stimulating Materials

Pearson maintains that given his extensive incarceration, treatment and therapy, his circumstances have changed to the degree that his viewing of mainstream adult themes or content now portrayed on TV and at the cinemas across the country would not offend public order nor safeguard society from repeat sexual offenses.  The 6th Circuit in U.S. v. Lantz 2011 U.S. App. LEXIS 234615 2011 Fed App. 0784N (6th Cir 2011), noted "the mass of literature and other media such a condition would encompass" and its substantial effect upon a defendant's ability "to receive information" in the present technological age.

On these facts and given Pearson's current circumstances the Court may wish to consider after conducting an analysis of the pertinent §3553(a) and §3583(d) factors, whether the general provisions of Special Condition 7 are sufficient to alleviate any concerns about Pearson's further collection of forbidden images, and whether the original condition as originally imposed is currently unwarranted.

## SPECIAL CONDITION 5

### Dating Restrictions as to Women With Children

Movant is prohibited from having any relationship, platonic or romantic, with any person who has a minor child, without prior written authorization from his parole officer. The First Amendment of the United States Constitution speaks to the ability of individuals to "enter into intimate relationships including the union of marriage, and to maintain other close familial relationships." Swanson v. City of Bruce, 105 Fed. Appx. 540, 542 (5th Cir. 2004).

"The concept of private association concerns the choice of individuals and organizations 'to enter into and maintain certain intimate and human relationships ... against undue intrusion by the [S]tate,'" Louisiana Debating Literary Ass'n v. City of New Orleans, 42 F.3d 1483, 1493 (5th Cir. 1995) (quoting Roberts v. United States Jaycees, 468 US 609, 617-18, (1984)). This concept is not limited to family relationships, but applies

to "deep attachments" that are "distinctively personal." <u>Wallace v. Texas Tech. Univ.</u>, 80 F.3d 1042, 1051-52 (5th Cir. 1996).

Moreover, the protection of personal activities is deeply rooted in our history and fundamental to our concept of liberty. <u>Washington v. Glucksberg</u>, 521 US 702, 727 (1997). One of those protected personal decisions is the freedom to marry. <u>Loving v. Virginia</u>, 388 US 1, 12 ("The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness.") and <u>Turner v. Safley</u>, 482 US 78, 95-96, (1987) (A "constitutionally protected marital relationship" exists even "in the prison context"). This also includes the ability to make decisions regarding personal, consensual sexual relationships. <u>Lawrence v. Texas</u>, 539 US 558, 567 (2003).

By prohibiting Defendant from forming any relationship, platonic or romantic with any person, who has a minor child, without prior, written authorization from his parole offecer, Plaintiff has imposed a severe restriction on a fundamental interest of historical significance.

As the Defendant has scrupulously complied with the rules of his incarceration and taken great steps to avail himself of therapy, the Court may wish to consider the rationale dicussed in <u>Jennings v. Owens</u>, 585 F. Supp. 881, 895-96 (W.D. Texas, Austin Division 2008) when deciding whether to exercize its discretionary authority and allow Pearson to pursue adult heterosexual relationships without prior approval by the probation officer.

## SPECIAL CONDITIONS 8 AND 9

### Occupational Restrictions

Defendant asks the Court whether, considering the progress he has made in post conviction rehabilitation, it would be reasonable to delete occupational restrictions which no longer are reasonably related to the Defendant's non-contact offense under 18 USC §2252A(a)(2). and would impose an overly harsh financial hardship on the Defendant as this senior citizen seeks employment teaching and caring for adults and reintegrating back into society.

## CONCLUSION

The Defendant does not challenge the legality of the Special Terms of Supervised Release. Rather, he respectfully seeks review of those conditions based on the Court's continuing authority to revise such conditions based upon further thought and in Pearson's case, his change of circumstances prior to his impending release.

Respectfully submitted,

*Ronald C. Pearson*

Ronald C. Pearson
Reg. No.
FCI Seagoville
P.O. Box 9000
Seagoville, TX 75159

## AFFIRMATION

I hereby affirm that the above and foregoing is true and correct pursuant to 28 USC §1746(2).

Executed, 28th of April, 2012

*Ronald Pearson*
Ronald Pearson

## CERTIFICATE (PROOF) OF SERVICE

I certify that on the 28th day of April, 2012, I deposited the original and suitable copies of Defendant's "Motion for Request for Modification of Special Terms of Supervised Release and Memorandum of Law" in the FCI Seagoville mail receptacle, first class postage prepaid, addressed to:

One (1) original and two (2) copies to:

    Clerk, U.S. District Court
    Nothern District of Texas
    1100 Commerce Street
    Dallas, TX 75242

        AND

One (1) copy to:

U.S. Attorney's Office
Earle Cabell Federal BLDG.
1100 Commerce St.
Dallas,TX 75242

_/s/ RP_

_/s/ Ronald C. Pearson_
Ronald C. Pearson

-10-